[Civ. Nos. 17237, 17238. Second Dist., Div. One. July 16, 1951.]

HARRY A. LORD, Respondent, v. A. H. HENDERSON et al., Appellants.

[Civ No. 17239. Second Dist., Div. One. July 16, 1951.]

ROY DIAL et al., Respondents, v. A. H. HENDERSON et al., Appellants.

[Civ. No. 17240. Second Dist., Div. One. July 16, 1951.]

UTILITY TRAILER SALES COMPANY (a Corporation) et al., Respondents, v. A. H. HENDERSON et al., Appellants.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Appellants.

Warren E. Libby for Respondents.

HANSON, J. pro tem.—The primary question for decision, in all four of the above-entitled appeals which were consolidated for trial in the court below, is whether the Caravan Act of 1937 is constitutional under the state and federal Constitutions. The constitutionality of the act under the federal Constitution has heretofore been challenged in the Supreme Court of the United States, but its constitutionality sustained in *Clark* v. *Paul Gray*, 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001], in an opinion by Chief Justice Stone, at that time Mr. Justice Stone. The endeavor here made to distinguish that decision which held that the Caravan Act did not violate the federal Constitution is predicated upon the theory that it was based on certain facts which in the instant cases, it is alleged, were proved not to be true. It should perhaps be stated at this point that the earlier 1935 Caravan Act was held unconstitutional in *Ingels* v. *Morf*, 300 U.S. 290 [57 S.Ct. 439, 81 L.Ed. 653], solely on the ground that a license fee of $15 per vehicle merely for administering the Caravan Act and policing caravan traffic was excessive and hence imposed an unconstitutional burden on interstate commerce.

The Caravan Act of 1937 which materially differs from the 1935 Act [shortly stated] imposes a flat tax of $15 ($7.50 for the privilege of using the public highways and $7.50 as a license fee for administration and policing the act—(a license good for a six-month period) on every motor vehicle (whether it has or has not been registered, if it be subject to registration in California) operated on its own wheels singly, in tow, or in a ''caravan'' or fleet, on the highways of this state, for the purpose of sale to, or purchase by, any person within or without the state, unless the operation is confined wholly within one of the two statutory zones of the state. Accord-

ingly, any operation of the character and for the purpose mentioned, whether in a caravan or not, across a zone line within the state or the boundary line of the state makes the vehicle subject to the tax. The tax is imposed (1) for the privilege of using the highways of the state and (2) for administration and policing purposes. The funds derived from the tax are thus expressly allocated and restricted by statute.

The act is assailed as being unconstitutional, or at least as being unconstitutional as applied to the individual respondents, on the ground (1) that it violates the commerce clause of the federal Constitution (art. I, § 8); (2) that it infringes the due process and equal protection clauses of the Fourteenth Amendment; (3) that it violates (a) the uniformity and the privileges and immunities clauses (art. I, §§ 11 and 21), and (b) the exemption and classification clauses of the state Constitution (art. IV, § 25, subds. 20 and 33).

Plaintiff Lord, as indicated by the above captions, instituted two actions, one in 1937 and another in 1943. Both actions challenged the validity of the Caravan Act of 1937. Lord caravans passenger motor vehicles, generally in pairs, i.e., a lead car and a car in tow—tandem style. The tandem is propelled by the lead car in which the driver sits. Usually the caravan or fleet of these tandem-hookups aggregates 10 or so tandems (20 cars) plus a single pilot car for the manager of the fleet and a single follow-up car driven by a mechanic. The cars for the most part are gathered at Detroit, Chicago, and Kansas City and are then driven overland to the principal coast cities of California. The drivers are recruited through want ads in newspapers at the point from which the trek originates. These want ads offer free motor transportation to California with meals and lodging en route together with $25 to $50 to the drivers for the services rendered.

The plaintiff Dial is a used car dealer with his principal place of business at Long Beach. As a part of his business operations he buys passenger-type automobiles in Chicago and causes them to be driven on their own wheels, with their foreign license plates, to Long Beach by drivers who are procured through ads in Chicago newspapers. Except in rare instances the automobiles are not driven in caravans or convoys. The drivers receive no pay and, what is more, are required to pay for their own lodging and meals together with the gasoline and oil used by the particular vehicles driven by them. There was evidence that such drivers took the minimum time for sleep en route.

The three plaintiff corporations Utility Trailer Sales Com-

pany (of Los Angeles), the Utility Trailer Sales Company of San Francisco, and the Utility Trailer Sales Company of Fresno are all engaged in selling the products of a manufacturer of commercial truck trailers and vans known as Utility Trailer Manufacturing Company. The sales companies all take delivery of the truck-trailers or vans at Los Angeles and then transport them on their own wheels in tow of another vehicle to their respective warehouses or salesrooms. The trailers or vans are of various sizes weighing when empty between 4,000 and 18,000 pounds. As a rule, it is not practicable to transport these trailers or vans by railroad because of their size, the cost of transportation and lack of cranes to unload them and hence they must be driven to their destination on the highways. They are not driven in caravan, except in rare instances.

The earlier Caravan Act of 1935 was intended to apply primarily to motor vehicles driven in caravans *into* the state for sale or exchange, hence the name given to the statute. The Caravan Act of 1937 applies not only to such vehicles, but to vehicles driven *intrastate* as well, unless restricted to a single zone within the state, and regardless of whether the vehicle is or is not a part of a caravan. Accordingly, the title of the present act, i.e., "Caravan Act of 1937" is something of a misnomer.

The primary object of the 1935 Act was to tax interstate caravaning, as such, into the State of California; that is, motor vehicles driven on our highways as a part of a caravan or fleet where the objective of the owner was a sale or exchange in this state of a vehicle unregistered in California, on the theory that such a commercial use of the highways discriminated against the owners of California registered vehicles and created an undue and unnecessary congestion and hazard to traffic on the highways, and particularly to drivers of California tax registered vehicles.

█ In seeking to impose a tax upon motor vehicles transported upon our highways *for gain* the Legislature is possessed of the constitutional power to place all such vehicles in one class and to place all vehicles not operated for gain in another class and to impose a greater tax upon the former than the latter (*Dixie Ohio Express Co.* v. *State Revenue Com.,* 306 U.S. 72 [59 S.Ct. 435, 83 L.Ed. 495]; *Clark* v. *Poor,* 274 U.S. 554 [47 S.Ct. 702, 71 L.Ed. 1199]; *Morf* v. *Bingaman,* 298 U.S. 407 [56 S.Ct. 756, 80 L.Ed. 1245]). █ It is not necessary for the Legislature, to achieve such a classification, to find

that there is a difference in the wear, tear and upkeep of the highways or in the hazards involved. These are proper but not requisite factors for the Legislature to take into consideration and to appraise, if ·it sees fit to subdivide the class or create proper exceptions to it. ▪ Moreover, if it appears to the Legislature that transporting motor vehicles on their own wheels creates large savings for the owners as compared with other modes of transportation, such as by rail, the saving may properly be considered in fixing the tax. (*Dixie Ohio Express Co.* v. *State Revenue Com.,* 306 U.S. 72 [59 S.Ct. 435, 83 L.Ed. 495] ; *Aero Mayflower T. Co.* v. *Georgia Pub. Serv. Com.,* 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1439] ; *Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053].)

 The initial question which we are called upon to determine, in the individual cases before us, is whether any one of them is distinguishable from the holding in *Clark* v. *Paul Gray* by reason of the findings of the trial judge below. For reasons presently to be stated, we think that upon the material and essential facts none of the cases can be distinguished from the Clark case and consequently each is controlled by it, so far as the attack against the Caravan Act of 1937 is rested on federal constitutional grounds.

In the Clark case the court said: ''It is true that the district court found that the practice of caravaning creates no additional traffic hazard, nor any undue wear and tear on the highways. But in this we think that its determination was not only contrary to the evidence, *but went beyond the judicial province.*'' (Italics supplied.) Likewise, it is true in the cases before us that the trial court found, as did the trial court in the ·Clark case that caravaning created no additional traffic hazard, nor any undue wear and tear on the highways. Indeed, in the instant cases the trial court went much further in its finding of facts which, in many instances, we regard as being contrary either to the evidence or to the physical facts, and, in every instance, beyond the judicial province. The facts as found by the trial court, as stated in its ''Memo of Decision,'' reads as follows :

''I do not find anything in the evidence taken here to support the conclusion of the trial court, as related on page 411 of the opinion in the case of *Morf* v. *Bingaman,* 298 U.S. 407 [56 S.Ct. 756, 80 L.Ed. 1245], and reiterated in the case of *Clark* v. *Gray,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001] . . . . with all due respect to the justices of that court.

''I cannot find from the evidence here that the drivers of

caravan cars had little interest in the vehicles they drive, nor any less regard than those of state licensed cars for the safety and convenience of others using the highway. They were certainly interested in protecting themselves from injury. Nor can I find that cars thus coupled and controlled frequently or otherwise, skid, either on curves or elsewhere, or that they cause any more wear and tear on the roads than any other single car, and no more when they are driven in doubles; nor that there were any increased difficulties in the operation of the coupled cars; nor that the length of the caravans to any appreciable degree increased the hazard and inconvenience to passing traffic; nor can I find from the evidence here that such traffic involved a special type of use of the highways which enhanced the wear and tear on the roads, nor that it augmented the hazards to other traffic; nor that they imposed on the state a heavier financial burden for highway maintenance and policing than do other types of motor traffic. There is no evidence of this at all in my opinion.''

In the usual and ordinary case instituted by or against the state, its various departments or officers, it is the duty of the trial court in nonjury cases, such as these cases are, to weigh the testimony upon the material issuable facts and make its findings thereon. But when the question at issue is that of the constitutionality of a statute, the duty which devolves upon the trial court is vastly different. In the latter case, the province of the court is not to weigh the evidence before it, but to ascertain whether there are any facts in the record *or outside of it,* of which it may take judicial notice, which would sustain the Legislature in enacting the statute (*Clark* v. *Paul Gray,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001]). In the instant cases there was an abundance of testimony, which the trial court was not privileged to disbelieve, which would have warranted the Legislature in finding the facts directly contrary to the facts as found by the court. The fact that the trial court found that plaintiff Lord did approximately 10 to 20 per cent of the business of caravaning in this state; that he exercised considerable care in selecting the drivers who responded to ads he placed in midwest papers where the caravaning originated; that his drivers, with one exception, had never been involved in an accident; that the tow-bar he used in case of ''hookups'' was the safest known; that he instructed his drivers to exercise the greatest of care, are all factors to the credit of Mr. Lord,

but they are of no materiality in the solution of the questions before us. The Legislature was not concerned with individual situations such as that of plaintiff Lord, but with an overall condition, which reflected that caravaning was a dangerous or hazardous practice; that it should be taxed to meet not only the cost of policing the traffic, but to yield the state a proper *quid pro quo* for the privilege of using its highways. (*Cf., Dixie Ohio Express Co.* v. *State Revenue Com.*, 306 U.S. 72 [59 S.Ct. 435, 83 L.Ed. 495]; *Aero Mayflower T. Co.* v. *Georgia Pub. Serv. Com.*, 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1439]; *Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053].)

Most of the drivers engaged by many caravan operators to caravan vehicles have never been in California and are wholly unfamiliar with mountain driving encountered on their route in this state. In many instances they are under age and often below the age required for an operator's license in California. The drivers generally do not have California operator's licenses and quite often no licenses from any other state. By proceeding in a caravan or as a fleet, the manager and mechanic can keep a check that would not otherwise be possible. If one car becomes disabled the whole fleet stops on or alongside the road so that the mechanic can repair the car or attach it to some other car in the fleet. The necessity of driving the cars in a fleet tends to keep one tandem after another rather closely together. On a two-lane highway, and there are several at the boundaries of the state, cars behind the fleet necessarily encounter difficulty in getting ahead of the fleet as a whole or in between the various tandems. It seems quite probable that the recruit drivers of the tandems oftentimes are not inclined to be very courteous to other cars on the highway, as for instance to aid them in passing or enable them to get into the line when necessary to avoid oncoming cars. When the tandem cars are compelled to stop suddenly, there is often a tendency to skid, to sway out of line or to "jack-knife," because the brakes on the forward car must alone serve for both cars. The front part of the towed car, including the windshield, is usually covered up so as to avoid mud and rains thrown back and upon it by the lead-car. This procedure naturally obscures the vision of a driver behind such a tandem as he can only see cars ahead of the tandem by looking out of his own left window.

In the individual case of Lord the facts just recited must be modified by saying that Lord's caravans do not take any mountain routes in California; that his drivers are over the

age of 21 and have chauffeur licenses issued by some state, but not necessarily California, that the drivers of his caravans have instructions from him to continue on and not stop if a car becomes disabled. But these differences in fact do not distinguish Lord's case from the *Clark* v. *Paul Gray* case. The latter case, however, involved only the operation of motor vehicles in a single caravan, convoy or fleet of vehicles and not that of a vehicle operated as a tandem or driven singly on its own power. As plaintiff Dial drives his cars singly and not as a part of a caravan, convoy or fleet and, as the same is true, as to the plaintiff sales companies, except that they drive their cars tandem, we turn to a discussion of these particular distinguishing features.

Unquestionably, the operation of a single passenger-type vehicle or of two such cars driven tandem is not as hazardous, as when driven as a part of a large caravan, fleet or convoy or as is the case of two large trucks or vans driven tandem. Nevertheless, the operation by Dial differs only from that of Lord in that his passenger motor vehicles are not operated in tandem or as a part of a caravan. However, Dial's drivers receive no pay whatever for their services nor do they receive lodging and food, and, what is more, must furnish such costs out of their own pockets, all of which is not true in the case of Lord. Accordingly, drivers of the type employed by Dial may be regarded as being inclined to be less careful than the type employed by Lord, as they are not supervised at all in the course of their cross-country trip and do not receive the financial return which Lord's drivers do.

But quite apart from these differences of fact it is obvious that the state may impose the caravan tax on these types of operation, unless it can be said that placing them within the purview of the statute here involved is otherwise improper.

Respondent Dial contends that there is nothing to distinguish his operations from that of a person who drives a passenger motor vehicle on a highway not for gain, or of a "dealer" or "transporter" who is permitted to drive such a vehicle for gain within a single zone, using dealers' or transporters' license plates which cost at most $5.00 a set. We think the contention overlooks fundamental distinctions. (*Cf., Dixie Ohio Express Co.* v. *State Revenue Com.*, 306 U.S. 72 [59 S.Ct. 435, 83 L.Ed. 495] ; *Matter of Application of Schuler*, 167 Cal. 282 [139 P. 685, Ann.Cas. 1915C 706].) As was said in *Hayes* v. *Missouri*, 120 U.S. 68 [7 S.Ct. 350, 30 L.Ed. 578] : "The Fourteenth Amendment to *the*

*Constitution of the United States does not prohibit legislation
which is limited either* in the objects to which it is directed,
or by *the territory within which it is to operate.* It merely
requires that all persons subjected to such legislation shall
be treated alike, under like circumstances and conditions, both
in the privileges conferred and in the liabilities imposed. As
we said in *Barbier* v. *Connolly* [113 U.S. 27, 32 (28 L.Ed. 923,
925)], speaking of the Fourteenth Amendment: 'Class legis-
lation, discriminating against some and favoring others, is
prohibited; but legislation which, in carrying out a public
purpose, is limited in its application, *if within the sphere of
its operation* it affects alike all persons similarly 'situated, is
not within the Amendment.' '' (Italics supplied.) The cog-
nate provisions of our state Constitution do not differ in
substance but only in terminology with those of the federal
Constitution.

▮ First, and foremost in considering the cases before us,
it needs to be recalled that the state owns its highways and
consequently may impose reasonable fees for their use by
vehicles moving interstate or intrastate. It may classify the
traffic, among other things, according to the character of the
traffic, or the purpose for which the highways are used, as
for instance whether it be for private gain or not. (*Dixie
Ohio Express Co.* v. *State Revenue Com.,* 306 U.S. 72 [59
S.Ct. 435, 83 L.Ed. 495]; *Aero Mayflower T. Co.* v. *Georgia
Pub. Serv. Com.,* 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1439].)
The tax imposed as to vehicles in one class need have no
resemblance in character or amount with that of vehicles in
another class, so long as the imposition itself is reasonable
with respect to the class. (*Capitol Greyhound Lines* v. *Brice,*
339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053].)

Consequently to point out, as respondents do, that motor
vehicles driven by the general public, not for gain, pay only
a license fee of $6.00 a year as against a fee of $15 for six
months by respondents who operate their vehicles for gain,
makes use of an entirely false analogy. Likewise, to point
out that the average cost of administering and policing such
general public traffic involves only a cost of $2.90 per vehicle
is equally beside the point. If the state instead of requiring
the payment of a license fee of $6.00 by the general public
for policing and administrative purposes required no fee at
all the respondents would have no standing under constitu-
tional law—state or federal—to complain. As the state may
prohibit all traffic for gain on its highways—intrastate or

interstate—so it may condition the privilege of the use of its highways by such traffic at a price that is not excessive or discriminatory to traffic of like character. (*Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053]; *Packard* v. *Banton,* 264 U.S. 140 [44 S.Ct. 257, 68 L.Ed. 596].)

In *Packard* v. *Banton,* 264 U.S. 140 [44 S.Ct. 257, 68 L.Ed. 596], the court said: "The contention most pressed is that the act unreasonably and arbitrarily discriminates against those engaged in operating motor vehicles for hire in favor of persons operating such vehicles for their private ends, and in favor of street cars and motor omnibuses. If the state determines that the use of streets for private purposes in the usual and ordinary manner shall be preferred over their use by common carriers for hire there is nothing in the 14th Amendment to prevent. The streets belong to the public, and are primarily for the use of the public in the ordinary way. Their use for the purposes of gain is special and extraordinary, and generally, at least, may be prohibited or conditioned as the legislature deems proper. Neither is there substance in the complaint that street cars and omnibuses are not included in the requirements of the statute. The reason, appearing in the statute itself, for excluding them, is that they are regulated by the Public Service Commission Laws; and this circumstance, if there were nothing more, would preclude us from saying that their noninclusion renders the classification so arbitrary as to cause it to be obnoxious to the equal protection clause."

We pass then to consider whether the tax levied against the class falling within the Caravan Act is excessive or discriminatory with respect to the levy made to "dealers" or "transporters" for caravaning within a single zone. ▮ We start with the observation that the state is under no obligation to provide license plates to either "dealers" or "transporters" to enable them to use its highways for private gain. If it chooses to grant the privilege to operate wholly within a single limited zone and extends that privilege equally to all who are engaged in caravaning therein there is no discrimination, as between zones, or states, or as to persons so engaged. To be sure there is a discrimination, of a sort, as between persons in one zone or state who wish to transport vehicles to another zone or state—and particularly where they are at or near a boundary line and do a large part of their business in another zone or state, but this is not a type of discrimination recognized as an illegal discrimination under the Constitu-

tion—state or federal. Local "dealers" or "transporters" with their places of business in one zone and possessed of "dealers" or "transporters" license plates are accorded no greater rights or privileges than those who are not in their category, as the latter have the same rights and privileges if their operations likewise are wholly within a single zone.

The mere fact, if it be a fact, that zoning the state into two zones, may seemingly have been somewhat arbitrary and unnecessary, as respondents contend, is of no moment, so long as operators in each zone are accorded the same privileges and where, as here, it cannot be said that the legislative determination was without any substantial basis (*Clark* v. *Paul Gray,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001]). The notion that a person engaged in caravaning within the borders of a state must be permitted to operate in all zones within a state without the payment of a tax is a fallacy long since exploded (*Hayes* v. *Missouri,* 120 U.S. 68 [7 S.Ct. 350, 30 L.Ed. 578]; *Packard* v. *Banton,* 264 U.S. 140 [44 S.Ct. 257, 68 L.Ed. 596]).

■ Accordingly, as neither "dealers" nor "transporters" located or operating within a single zone can transport their vehicles for the purpose of selling, buying or exchanging them beyond the limits of their own zone without paying the caravan tax, even though they are possessed of dealers' or transporters' license plates, it follows they have privileges equal only to those who are not so situated, including interstate transporters without such license plates. That being true it follows that there is no inequality as to them in the "protection of the law" or any discrimination as between them. [10] The difficulty with the position taken by respondents is their assumption, that just because the law at one time accorded to "dealers" and "transporters" possessing special plates the right to transport their cars anywhere in the state, the right could not be cut down by subsequent legislation. Naturally there is no merit in the contention.

The reason for exempting dealers or transporters from the operation of the caravan tax so long as they restrict their operations within a single zone is obvious. (*Matter of Application of Schuler,* 167 Cal. 282 [139 P. 685, Ann.Cas. 1915C 706].) Dealers, as is well known, tend to confine their activities of selling and demonstrating their vehicles to very limited areas, because of competitive and other conditions. In the case of heavier equipment such as large trucks, vans, and the like, an even lesser use is made of the highways due to the

fact that buyers of such equipment generally do not require demonstrations of the equipment on the highways before making a purchase. However, such purchasers often come from a distance or require delivery of the equipment to distant points within the state. But again the use of the highways of the state is quite negligible. Moreover, sales by such dealers lead to prompt registration of the vehicles and the payment of registration fees and quite substantial property taxes. In the case of metropolitan dealers the areas generally coincide with that area; in the less populous areas the area is generally limited to a county or two. Accordingly, the use of the highways in either case is slight and not at all commensurate with the area in which their dealers' plates permit them to operate. In the case of transporters the same is generally, but not always, true. However, as neither transporters nor dealers operating within a single zone or beyond are accorded privileges that are not accorded to others who have neither dealers' nor transporters' plates there is no legal discrimination as between any of these various groups. Companies, such as railroads or so-called automobile truckaway concerns, who own their own equipment upon which they transport motor vehicles are in a distinct class and so are not to be compared with the respondents. We see no need of elaborating upon the point or of setting forth the differences existing between the two groups. (*Cf. Aero Mayflower T. Co.* v. *Georgia Pub. Serv. Com.,* 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1439]; *Packard* v. *Banton,* 264 U.S. 140 [44 S.Ct. 257, 68 L.Ed. 596].)

The respondents next contend that the license fee of $7.50 levied for the purpose of reimbursing the state for expenses incurred in the collection of such fees and in the administration and enforcement of the act and the expense of policing the highways with respect to caravaning is excessive.

The burden of showing the fee is excessive is upon respondents and not on appellants as respondents contend. (*Clark* v. *Paul Gray,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001].) The cases cited by respondents such as *D. E. Foote & Co.* v. *Stanley,* 232 U.S. 494 [34 S.Ct. 377, 58 L.Ed. 698], *Great Northern R. Co.* v. *Washington,* 300 U.S. 154 [57 S.Ct. 397, 81 L.Ed. 573], *Brimmer* v. *Rebman,* 138 U.S. 78 [11 S.Ct. 213, 34 L.Ed. 862], involved in whole or in part "inspection fees" where the rule as to the burden of proof is otherwise. This is due to the fact that article I, section 10, of the federal Constitution expressly provides that "No state shall, without the consent of the Congress, lay any imposts or duties on im-

ports or exports, except what may be absolutely necessary for executing its inspection laws.'' No ''imposts or duties on imports or exports'' are here involved as was the situation in the cases mentioned. We think the respondents here failed to meet the burden. To be sure the trial court found, upon insufficient evidence and a misconception of law, that the license fees were excessive in that the cost was much less than $5.00.

█ The court seems to have arrived at this figure in large part, if not wholly, by using as a yardstick the average cost of policing *all* registered motor vehicles operated within the state and the cost of administering the Motor Vehicle Act and the Caravan Act which the court found amounted to $2.90 per vehicle. Not only was this not a proper criterion, but it ignored various highly important factors. For instance, the cost of ferreting out those who sought to evade the caravan tax—who, driving on the highway, could not be distinguished from the general motoring public; the saving involved in having a single well-established over-all police force and administrative unit, instead of a separate one set up to police or administer the Caravan Act; and, other factors which need not here be detailed. It is enough to say, as the Supreme Court of the United States has said, that ''the States are not hobbled in exercising rough judgment in devising tax formulas, giving to . . . [the] . . . relevant factors such respect as is fairly within the restraints of decency.'' (*Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053]—the language is of the dissent, but not contrary to language of the majority.) In the cases before us we take judicial notice of the fact that the rail freight transportation charge of a single passenger motor vehicle from Detroit to Los Angeles costs between $250 and $350, whereas operated on its own wheels over the highways between Detroit and Los Angeles it is much less than $100. █ Accordingly, a charge of $15 per vehicle (1) *for policing and administration of the act* and (2) for the privilege of using the highways of this state for a period of six months is not economic discrimination, much less illegal discrimination and in no event excessive. In that connection it needs to be observed that the Caravan Act tax is in lieu of all other taxes policing or otherwise so long as the vehicle taxed is not sold or exchanged during the six-month period and entirely regardless of the mileage covered by the vehicle over the state highways or any other factor. To illustrate how this can redound in favor of a

caravan taxpayer as against a registered car owner, let us review the status of each at the end of five months. If a passenger vehicle is purchased for $3,000 in the Middle West and brought into the state and registered in January the registered owner must pay a license tax of $6.00 (Veh. Code, § 370) and an additional property tax of about $60 (Rev. & Tax. Code, § 10752). If he brings the car into the state and has it registered in June he pays only 7/12 of these amounts or a total of $38.50. In the case of a caravan owner he pays a caravan tax of only $15 if the vehicle is brought into the state in January and if it is sold and registered in June the purchaser pays only a tax of 7/12 of $66 or $38.50. Hence the charge against the car in the latter case for the caravan and registration fee is only $53.50 for the entire year as against a charge of $66 against the registered owner for the same length of time. This most certainly is not discrimination against caravaned vehicles. The fact that the caravaned vehicle may be sold by its owner within a month of its arrival in the state *in January* and as a consequence the tax totals $81 as against a registered owner whose tax under like circumstances is $66 is immaterial. This for the reason, as the Supreme Court of the United States states: "The fee is for the privilege for a use as extensive as the carrier [here the caravan owner] wills that it shall be. There is nothing unreasonable or oppressive in a burden so imposed . . . One who receives a privilege without limit is not wronged by his own refusal to enjoy it as freely as he may." (*Aero Mayflower T. Co.* v. *Georgia Pub. Serv. Com.*, 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1439].) So, likewise, it may be said that the owner of a caravaned car who fails to make full use of the highways of the state for a period of six months, as he is permitted by the law to do, cannot complain, that others, such as drivers for pleasure, drive several thousand miles in the same period. In short, there is in neither case any restriction on mileage.

The record before us does not disclose the initial cost expended by the state for the highways used by the respondents or the maintenance thereof, nor the separate cost of policing the caravaning thereon or of administering the Caravan Act, with respect to these highways separate and apart from the Motor Vehicle Act. What is plainly shown is that the economic saving of the use of highways by the respondents over the use of other modes of transportation exceeds many times over the cost of either the policing license fee or the use

of the highways. So viewed, we fail to see that either fee is excessive or discriminatory and we see no basis whatever for holding either to be unconstitutional upon any of the grounds assigned.

If we correctly understand the position of respondents, they contend that, quite apart from any question of the constitutionality of the Caravan Act of 1937 they never were and are not now under a duty to pay the tax levied by that act upon their activities even if they fall within the scope of the act. In support of this contention they argue that as they are either ''dealers'' or ''transporters'' they are exempt from the operation of the act by virtue of the provisions of the earlier enacted sections 205, 206 and 207 of the Vehicle Code as these sections, so they contend, were not repealed by the act which repealed the Caravan Act of 1935 nor are they repealed by the provisions of the Caravan Act of 1937. The sections of the Vehicle Code referred to permit a ''dealer'' (with an established place of business in California) or a ''transporter'' (as defined in Veh. Code, § 73.3) to move upon the highways of this state motor vehicles of a character which must be registered in California, before such registration, provided such dealers or transporters have been granted ''dealers' plates'' and the same are displayed on the vehicle or without such plates where the movement is ''from a vessel, railroad depot or warehouse over the highways to a warehouse or salesroom upon first having obtained a written permit authorizing such operation from the department.''

We think it plain that the language of the later Caravan Act of 1937 which expressly refers to and includes dealers and transporters as being subject to the act, of necessity, must be construed as modifying the provisions of sections 205, 206 and 207. Respondents cite no authority holding to the contrary and in fact do not cite any authority in support of their argument. The net effect of the two acts (the Vehicle Code and the Caravan Act) is to divide or classify the business of dealers and transporters into two categories, i.e., the sale or transportation or both of motor vehicles (1) wholly within a single zone and (2) from or to another zone or state. The basis for this classification rests on numerous and diverse factors which while somewhat narrow we regard as being adequately distinctive. If then the classification is proper and is not discriminatory as we have already stated it is not, the act is constitutional.

As far back as 1914 the Supreme Court of this state in *Matter of Application of Schuler,* 167 Cal. 282 [139 P. 685,

Ann.Cas. 1915C 706], held that the Motor Vehicle Act was not unconstitutional because it placed ordinary operators of motor vehicles in one class and dealers in another with a differential in fees favoring the dealers. The court said: ''Nor is the act illegally discriminatory either because it applies to motor vehicles *and not to other kinds* or because it places dealers in a class by themselves and exacts from them a fee of fifty dollars if they operate not more than five automobiles and ten dollars for every motor vehicle in excess of five so operated. To the first objection the answer is that the power of the legislature being plenary in the matter of imposing this privilege tax, it may designate any class properly subject to such exaction. For the same reason it may exempt any class. (*In re Wilmerding,* 117 Cal. [281,] 287, [49 P. 181].) No doubt the legislature took into consideration the fact that motor cars in the possession of dealers are usually kept for sale and are not used in the ordinary way, but merely for purposes of 'demonstration' and exhibition to intending purchasers. Dealers are therefore placed in a class by themselves.

''Nor is the exemption of nonresidents from paying the tax for a period of three months an unlawful one. Similar exemptions have been sustained upon the principle that the nonresidents are presumed to have paid all necessary licenses in their respective places of abode, and that their use of the roads in the territory subject to the provision of the act is usually but temporary.''

The case of *Franchise Motor Freight Assn.* v. *Seavey,* 196 Cal. 77 [235 P. 1000], upon which respondents so heavily rely is not in point. In that case a statute required common carriers by motor truck desiring to operate between fixed termini or over regular routes to obtain from the Railroad Commission, as a condition of operating, certificates of public convenience and necessity. However, the statute exempted common carriers engaged exclusively in hauling the products or implements of husbandry. It was held that there was no reasonable distinction or substantial difference justifying the inclusion of the one and the exclusion of the others. We have no such case here.

Before concluding our opinion we wish to interpolate, by stating that the briefs in this case, as in many other recent cases presented to us, fail to set forth a Summary of the Facts as required by rule 13 of the Rules on Appeal. Instead, the opening brief presents a summary of the testimony of the

various witnesses which covers 86 pages. Under a heading entitled Statement of Evidence consisting of 90 pages respondents likewise give us merely a narrative résumé of the testimony of the various witnesses. These summaries of evidence are not what is contemplated by the rule. As a consequence of the presentation here made we have been compelled to ferret out a statement or summary of the material facts which should have been given to us in the briefs. We give the warning now so that in future cases, counsel will not be taken by surprise if they find their briefs are stricken for failure to comply with the rules.

The judgments in each of the above-entitled cases along with the special order in cause No. 17237 are hereby reversed with instructions to the trial court to enter judgments for the defendants therein and to enter an order directing that the moneys (apparently in the sum of $86,177.50) now held in a special fund by the Department of Motor Vehicles be paid into the state treasury.

White, P. J., and Doran, J., concurred.

The opinion was modified to read as above printed and a petition for a rehearing was denied August 15, 1951.

Respondents' petition for a hearing by the Supreme Court was denied September 13, 1951. Carter, J., and Schauer, J., voted for a hearing.