[Civ. No. 10569. Third Dist. Aug. 21, 1963.]

WILLIAM E. DOYLE, Plaintiff and Appellant, v. THE BOARD OF BARBER EXAMINERS, Defendant and Respondent.

Edward P. Freidberg for Plaintiff and Appellant.

Stanley Mosk, Attorney General, E. G. Funke, Assistant Attorney General, and F. Richard Lucas, Deputy Attorney General, for Defendant and Respondent.

FRIEDMAN, J.—After a hearing, respondent Board of Barber Examiners ordered a 15-day suspension of petitioner's certificates as a registered barber and as operator of a barbershop. Basis of the order was a finding that petitioner had employed three apprentices in a single shop, in violation of section 6550 of the California Business and Professions Code. Petitioner instituted the present proceeding, seeking a writ of mandate to annul the suspension. In the court below the parties stipulated that petitioner indeed had employed three apprentices in a single shop and that the only issue was constitutionality of the statutory restriction. The lower court concluded that the statute was constitutional and denied the writ. Petitioner appeals.

Section 6550 of the Business and Professions Code reads as follows: "No registered apprentice may independently practice barbering, but he may as an apprentice do any or all of the acts constituting the practice of barbering under the immediate personal supervision and employment of a registered barber.

"Each shop may employ apprentices in the ratio of one apprentice to each registered barber working in the shop, but not to exceed two apprentices in each shop."

The parties' constitutional contentions are intertwined with conflicting interpretations of the statute. Petitioner construes the statute as permitting a ratio of one apprentice per registered barber in the shop, even though the latter is himself only an employee. The board, on the other hand, contends that section 6550 imposes a ceiling of one apprentice per barbershop-owner, regardless of the number of registered journeymen employed in the shop. Obviously there are fewer shops in California than registered barbers. Thus judicial acceptance of one or another of these conflicting interpretations would greatly expand or limit the permissible number of barber apprentices in this state. In our view, legality of petitioner's conduct does not turn on resolution of these conflicting claims, hence it is unnecessary to pass on them.

Just as plainly as words may do, section 6550 imposes a limit of two apprentices in any one barbershop. Petitioner admits his employment of three apprentices in a single shop. If the limit of two apprentices per shop is valid, petitioner

must lose his appeal regardless of interpretive quarrels over other aspects of the statute.

Petitioner's contention is that the statutory limitation is an arbitrary and unreasonable exercise of the state's police power, violative of the due process of law guaranteed to him by the Fourteenth Amendment to the federal Constitution and by article I, section 13, of the state Constitution. The contention raises issues in that area of constitutional law called "substantive due process." Petitioner places reliance on *Marx* v. *Maybury*, 30 F.2d 839, and *Hoff* v. *State*, 39 Del. 134 [197 A. 75]. In the former a three-judge federal court invalidated a Washington statute which prohibited employment of more than one apprentice per barbershop. In the latter a Delaware statute limiting beauty shop apprentices was held arbitrary and violative of due process.

■ California law establishes a Board of Barber Examiners, requires licensing of barbers, barber apprentices, shops and barber colleges; fixes standards of training, education and morality, and imposes sanitary regulations. (Bus. & Prof. Code, §§ 6500-6636.) Licensing or registration as a barber requires an 18-month period as a registered apprentice "under the immediate personal supervision and employment of a registered barber." (Bus. & Prof. Code, § 6545.[1]) Apprenticeship, in turn, must be preceded by graduation from an approved barber college, administering a course of not less than 1,248 hours at a rate not exceeding eight hours per working day. (Bus. & Prof. Code, §§ 6546, 6535.) The barber college course thus requires a minimum of about six months. Combined length of schooling and apprenticeship is two years. Passage of an examination is a preliminary to registration either as a barber or as a barber apprentice. (Bus. & Prof. Code, §§ 6545, 6546.) A registered apprentice may do all the acts constituting the practice of barbering under the immediate supervision and employment of a registered barber. (Bus. & Prof. Code, § 6550.) The practice of barbering without an appropriate certificate of registration is unlawful. (Bus. & Prof. Code, §§ 6523, 6524.)

The general validity of such a statutory licensing system cannot be seriously questioned. Public health, sometimes described in terms of sanitation or safeguards against commu-

---

[1]Apprenticeship provisions of §§ 6545 and 6546 have been amended by chapter 690, Statutes of 1963. One amendment reduces the apprenticeship period to 15 months under prescribed circumstances. Otherwise the amendments do not bear upon the present case.

nicable disease, is regarded as the police power objective which justifies licensing of barbers. (*In re Scaranino,* 7 Cal. 2d 309, 311 [60 P.2d 288]; *Ganley* v. *Claeys,* 2 Cal.2d 266, 268 [40 P.2d 817]; 7 Am.Jur. 613-614, 616-617; Notes 20 A.L.R. 1111, 98 A.L.R. 1080; see Fellman, *A Case Study in Administrative Law—The Regulation of Barbers,* 26 Wash. L.Q. 213.) Some occupational licensing laws aim at assuring the public a minimum standard of training, experience and proficiency in the particular calling. (*Rosenblatt* v. *California State Board of Pharmacy,* 69 Cal.App.2d 69, 73 [158 P.2d 199]; *Whitcomb* v. *Emerson,* 46 Cal.App.2d 263, at p. 273 [115 P.2d 892]; 11 Cal.Jur.2d 565.) Dictum in a California decision recognizes "the purpose of standardizing competency of barbers" as one objective of barber licensing. (*In re Boehme,* 12 Cal.App.2d 424, 428 [55 P.2d 559].) Statutory demands for minimum education and training as a condition of barber licensing are usually viewed as ancillary to the primary purpose of public health protection. (*Moler* v. *Whisman,* 243 Mo. 571 [147 S.W. 985]; 7 Am.Jur., Barbers, § 7, p. 616; Fellman, *op. cit.,* pp. 217-218.)[2]

On occasions in the past, California courts have nullified particular barbering regulations having no connection with the public interest. *Ex parte Jentzsch,* 112 Cal. 468 [44 P. 803, 32 L.R.A. 664], nullified a former Penal Code section which required barbershops to close on Sunday afternoon. Later the courts invalidated a legislative attempt to impose a similar closing requirement as part of the statewide licensing law. (*In re Scaranino, supra,* 7 Cal.2d 309; *In re Boehme, supra,* 12 Cal.App.2d 424.) Both cases evidenced the view that statutory attempts to eliminate or restrict competition among barbers would not stand the test of constitutionality. Thus, in *Scaranino* (7 Cal.2d at p. 312) the court stated: "The . . .

---

[2] A 1956 report of the State Senate Interim Committee on Licensing Business and Professions states: "The basic reason for licensing of barbers is to protect the public from the 'transmission of disease in view of the personal touch and contacts manifested and exercised in the barber business' and to avoid injury to the customer which might result from the service performed. This is accomplished by requiring that barbers have certain education and experience to assure knowledge of the possible effects of procedures (such as massage) and equipment (cutting instruments) and cosmetic and other agents (such as dyes) which they use on customers; the regulation and enforcement of sanitary procedures and conditions in shops; and the disciplining of licentiates whose continued practice would constitute a threat to the public. Demands of the Barber Board for a demonstration of competence in the performance of barbering service is a by-product of the licensing statute oriented toward public health. . . ." (Quoted in 1957 Appendix to Journal of the Senate, vol. 2, at p. 34.)

[statute] here involved cannot, of course, be upheld as a valid restriction of competition among those engaged in the profession of barbering." In the *Boehme* case (12 Cal.App. 2d at p. 429), the court remarks: "It seems apparent to us that the real object in view in enacting . . . [the statute] was not to prescribe one day of rest in seven for barbers, but plainly to restrict competition among the owners of the shops. Such an object is certainly not within the police power under our Constitution."

In *Ganley* v. *Claeys, supra,* 2 Cal.2d 266, the court invalidated a local ordinance regulating barbershop hours as having no relationship to its claimed public health objective. Another ordinance, prohibiting outdoor posting of barbershop price lists, was seen as an arbitrary exercise of police power. (*People* v. *Osborne,* 17 Cal.App.2d Supp. 771 [59 P.2d 1083].) Local ordinances adopted under authority of a state law and attempting to fix prices of barbering services were nullified in *In re Kazas,* 22 Cal.App.2d 161 [70 P.2d 962], and *In re Landowitz,* 22 Cal.App.2d 733 [71 P.2d 334]. In the *Kazas* case the court noted that the legislation was not for the benefit of the general community but for the benefit of barbers alone.

To a minor extent some of these decisions, especially *Ex parte Jentzsch, supra,* rest on the constitutional inhibition of special or class legislation. For the most part, however, these are "due process" cases, holding that the attempted regulations were arbitrary, having no reasonable connection with the public health and welfare.

 The right to engage in a legitimate employment or business receives recognition as a portion of the individual freedoms secured by the due process provision of the federal and state Constitutions. (*Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 238-239 [77 S.Ct. 752, 1 L.Ed.2d 796, 801-802, 64 A.L.R.2d 288]; *Truax* v. *Raich,* 239 U.S. 33, 41 [36 S.Ct. 7, 60 L.Ed. 131, 135]; *Bautista* v. *Jones,* 25 Cal.2d 746, 749 [155 P.2d 343].) This freedom is subject to the state's police power, which is simply the power to subject individuals to reasonable regulation for the purpose of achieving governmental objectives such as the public safety, health, morals and public welfare. (*Berman* v. *Parker,* 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. 27]; *Nebbia* v. *New York,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469]; *Wholesale Tobacco Dealers Bureau of So. Cal. Inc.* v. *Na-*

*tional Candy & Tobacco Co.,* 11 Cal.2d 634, 643-646 [82 P.2d 3, 118 A.L.R. 486]; *Miller* v. *Board of Public Works,* 195 Cal. 477, 484-485 [234 P. 381, 38 A.L.R. 1479]; 2 Cooley, Constitutional Limitations (8th ed.) pp. 1224-1227.)

■ "Reasonable regulation" implies that the regulatory objective is the welfare of the general public as contrasted with that of a special class or segment. (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners,* 40 Cal.2d 436, 443 [254 P.2d 29].) The law must not be arbitrary; it must rest upon "adequate reason." (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra.*) If the general objective of the law is within the state's regulatory power, its individual provisions must have a "real and substantial relation" to that objective (*Allied Properties* v. *Department of Alcoholic Beverage Control,* 53 Cal.2d 141, 146 [346 P.2d 737]; *Serve Yourself Gas etc. Assn.* v. *Brock,* 39 Cal.2d 813, 817 [249 P.2d 545].)

■ In the field of occupational licensing the requirement must have a "rational connection" with fitness to practice the particular vocation or profession; otherwise it is discriminatory and arbitrary. (*Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 239 [77 S.Ct. 752, 1 L.Ed.2d 796, 801-802, 64 A.L.R.2d 288]; *Konigsberg* v. *State Bar,* 353 U.S. 252, 262 [77 S.Ct. 722, 1 L.Ed.2d 810, 819]; *Whitcomb* v. *Emerson, supra,* 46 Cal.App.2d 263, 273-274; cf. *Williamson* v. *Lee Optical of Okla.,* 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563]; see Hetherington, *State Economic Regulation and Substantive Due Process of Law,* 53 Nw.U.L.Rev., 13-32, 226-251.)

■ Justice Holmes' aphorism, "General propositions do not decide concrete cases," receives resounding affirmation in the field of economic due process. Reasonable judges may easily differ over a statute's "reasonable relation" or "rational connection" with the public welfare. These verbal formulae, which assume to express judicial criteria of constitutionality, are as loose as they are pliable. What seem to be standards turn out to be only admonitions, reflections of attitude. Small wonder that appellate decisions on validity of state economic regulations feature vigorous dissenting opinions. (See *Consolidated Rock Products Co.* v. *City of Los Angeles,* 57 Cal.2d 515 [20 Cal.Rptr. 638, 370 P.2d 342]; *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141; *In re Petersen,* 51 Cal.2d 177 [331 P.2d 24, 77 A.L.R.2d 1291]; *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d 436.)

In this area of adjudication judges must take care to pursue objective legal standards rather than personal economic and social predilections. (See, Mason, The Supreme Court—Palladium of Freedom, p. 167; Rodell, *For Every Justice, Judicial Deference Is a Sometime Thing,* 50 Georgetown L.J. 700.) Judicial hostility to legislation adopted at the request of special interest lobbies has shaped constitutional decisions in some jurisdictions. (See, for example, *S. S. Kresge Co.* v. *Couzens, Mayor of Detroit,* 290 Mich. 185 [287 N.W. 427]; Dykstra, *Legislative Favoritism Before the Courts,* 27 Ind. L.J. 38, 44-45; Gellhorn, Individual Freedom and Governmental Restraints, 121-124.) Decisions of the federal Supreme Court and of the California Supreme Court demonstrate that legislative motivation plays no role in constitutional judgments. (*Daniel* v. *Family Security Life Ins. Co.,* 336 U.S. 220, 224 [69 S.Ct. 550, 93 L.Ed. 632, 636-637, 10 A.L.R.2d 945]; *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141; *In re Petersen, supra,* 51 Cal.2d 177.) Nor are political slogans revolving around the free enterprise concept appropriate to the judgment. Unless that judgment is to have the arbitrariness claimed for the statute under attack, we must seek out and apply such objective, judicially established standards as are available.

These standards, caught up in the flux of social development and shifting judicial attitudes, have undergone considerable change. The tide of judicial supervision over regulatory legislation ran high during the first three decades of the century. Courts indulged in independent investigations of reasonableness and nullified statutes regarded as arbitrary. Judicial veto of economic legislation deemed to be unreasonable or arbitrary occurred in many notable decisions such as *Lochner* v. *New York,* 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937] (nullifying legislation limiting working hours in bakeries), *Adkins* v. *Children's Hospital,* 261 U.S. 525 [43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238] (invalidating a minimum wage law), and *Ribnik* v. *McBride,* 277 U.S. 350 [48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327] (invalidating regulation of employment agency rates). During the thirties a turn of the tide was marked by such decisions as *Nebbia* v. *New York, supra,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469] (upholding New York's milk pricing law), and *Olsen* v. *Nebraska,* 313 U.S. 236 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500] (sustaining regulation of employment agency

rates). The tide has continued in ebb stage.[3] A representative expression of current doctrine is *Williamson* v. *Lee Optical of Okla., supra,* 348 U.S 483, at pp. 487-488 [75 S.Ct. 461, 99 L.Ed. 563, 571-572] : ''The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. . . . But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

''The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. [Citations.] We emphasize again what Chief Justice Waite said in *Munn* v. *Illinois,* 94 U.S. 113, 134 [24 L.Ed. 77, 87], 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' ''

The two cases on which petitioner relies—the federal decision, *Marx* v. *Maybury,* and the Delaware decision, *Hoff* v. *State*—nullified regulatory legislation much like the barber-apprentice law involved here. Both decisions are prime examples of the courts' former tendency to veto state economic regulations on constitutional grounds. Interestingly enough, both cases cite a dictum in *Mugler* v. *Kansas,* 123 U.S. 623, 661 [8 S.Ct. 273, 31 L.Ed. 205, 210], which expresses the now-discredited notion that the courts will invalidate economic legislation found, after judicial inquiry, to be unreasonable.

A secondary characteristic of federal due process in its present condition becomes apparent with awareness that intensity of judicial control is influenced by the kind of constitutional right involved; that state interference with economic liberty is relatively immune from the more intense judicial scrutiny bent upon interferences with civil or political rights. We describe the distinction without pausing to debate its logic.[4]

---

[3]This phase of American constitutional history is discussed more fully in McCloskey, *Economic Due Process and the Supreme Court,* Supreme Court Review 1962, U. of Chi. Press, pp. 34-62; Hetherington, *State Economic Regulation and Substantive Due Process of Law, supra;* Kappes, *The Second American Revolution: Free Enterprise Under the Bill of Rights,* 46 A.B.A.J. 597.

[4]Judicial restraint in some areas of due process, assertiveness in others, have led to formulation of the ''preferred freedoms'' concept. (See

■ The federal Supreme Court's abstention finds its California parallel. Although the state Supreme Court has continued to speak in terms of statutory reasonableness and the necessity for a real relationship between economic legislation and public weal, it has accompanied these expressions with others demonstrating a high degree of judicial self-restraint. A definitive description of judicial function in relation to the police power occurs in *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 522: ''. . . the determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity? ■ Thus in *Miller* [v. *Board of Public Works,* 195 Cal. 477], *supra,* this court said in 195 Cal. at page 490: 'The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation . . . [W]hen the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.' '' (See also *Los Angeles Met. Transit Authority* v. *Public Util. Com.,* 59 Cal.2d 863, 867 [31 Cal.Rptr. 463, 382 P.2d 583]; *Dittus* v. *Cranston,* 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347

Mason, The Supreme Court—Palladium of Freedom, *op. cit. supra,* 151-173; McCloskey, *op. cit. supra* footnote 3, pp. 45-50.) Compare, for example, *Konigsberg* v. *State Bar, supra,* 353 U.S. 252 [77 S.Ct. 722, 1 L.Ed.2d 810], with *Williamson* v. *Lee Optical of Okla., supra,* 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563] both of which were due process cases. In his dissent in *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 646-649 [63 S.Ct. 1178, 87 L.Ed. 1628, 1641-1643, 147 A.L.R. 674], Mr. Justice Frankfurter protested that judicial authority does not vary according to the nature of the challenge to legislation. (See also *Kovacs* v. *Cooper,* 336 U.S. 77, 90-91 [69 S.Ct. 448, 93 L.Ed. 513, 524-525, 10 A.L.R.2d 608] (dissent); Frankfurter, *Marshall and the Judicial Function,* 69 Harv.L.Rev. 217, 230-231.)

P.2d· 671]·; *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d at 146; *In re Petersen, supra,* 51 Cal.2d at p. 182.)

 Doctrinal statements as to extent of the police power are only superficially distinct from descriptions of the judicial role. Both really describe the same subject. The boundary of legislative power is situated wherever the judiciary locates a constitutional fence. When the fence is retracted, the power advances. Thus the rule of judicial self-restraint becomes nothing less than a substantive constitutional doctrine. As we understand current doctrine, judicial examination of a statute under economic due process attack is completed when any fact or facts appear which the Legislature might rationally have accepted as the basis for a finding of public interest. (*United States* v. *Carolene Products Co.,* 304 U.S. 144, 152 [58 S.Ct. 778, 82 L.Ed. 1234, 1241]; *Williamson* v. *Lee Optical of Okla., supra,* 348 U.S. 483, at pp. 487-488 [75 S.Ct. 461, 99 L.Ed. 563, 571-572]; *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d at p. 522; *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d at p. 148.) On this point federal and California doctrines appear to parallel.[5]

 In determining validity of police power exercises, California decisions of the past voiced the notion that regulatory restrictions on private liberty will be balanced against the benefit to the public. (*In re Porterfield,* 28 Cal.2d 91, 102 [168 P.2d 706, 167 A.L.R. 675]; *State of California* v. *Marin*

---

[5]Critics have expressed concern over the multiplicity and increasing tightness of regulations embedded in state licensing laws, which extend over an ever-widening sector of the economy. Much of this taut regulatory network has been created not by public demand or demonstrated public need, but in response to demands of the regulated groups themselves. (Gellhorn, *op. cit. supra,* pp. 105-151; Dykstra, *op. cit. supra,* 27 Ind.L.J. at 38-41; Doyle, *The Fence-Me-In Laws,* Harper's Mag., vol. 205 (Aug. 1952) p. 89); Graves, *Professional and Occupational Restrictions,* 13 Temp.L.Q. 334; Hanft & Hamrick, *Haphazard Regimentation Under Licensing Statutes,* 17 N.C.L.Rev. 1.) Curiously enough, this expansion of regulatory legislation has coincided with the trend of judicial withdrawal. The federal Supreme Court's virtual renunciation of its former role as constitutional arbiter of state economic legislation may be ascribed to that court's developed concept of its own role in federal-state relationships rather than its wish to fashion an exemplar for court-legislature relationships at the state level. The due process concept emanating from state constitutions is not necessarily circumscribed by notions of federal review. The suggestion has been made that the federal Supreme Court's withdrawal offers state courts an opportunity for a more active and perhaps more constructive role. (Freund, *On Understanding the Supreme Court,* p. 116; Hetherington, *op. cit. supra,* pp. 250-251.)

*Mun. Water Dist.,* 17 Cal.2d 699, 706 [111 P.2d 651] ; 11 Cal. Jur.2d, Constitutional Law, § 157, pp. 541-543.) Again, it has been said that the extent of regulation of private business must be commensurate with the evils to be remedied. (*In re Fuller,* 15 Cal.2d 425, 431 [102 P.2d 321].) The qualitative role implied by such pronouncements has been renounced *sub silentio* in the more recent decisions. If the judicial arm stops swinging upon postulation of any rationally acceptable hypothesis for the statute, without regard to the real facts which motivated its enactment, there is little elbow room for balancing private burdens against public benefits. The process stops as soon as any public benefit is hypothesized.

The question, then, is simply this: Are there any facts in the record or of which we may take judicial notice which might justify the Legislature in adopting Business and Professions Code section 6550? (*Lord* v. *Henderson,* 105 Cal.App.2d 426, 433 [234 P.2d 197] ; 11 Cal.Jur.2d, Constitutional Law, § 183, pp. 583-584; see Note, *Consideration of Extrinsic Evidence on Question of Constitutionality or Unconstitutionality of Statute,* 82 L.Ed. 1244-1262.) In the pursuit of acceptable legislative hypotheses, judges have not hesitated to draw upon their own experience and upon abstract studies in the particular regulatory field. (See, for example, *Williamson* v. *Lee Optical of Okla., supra,* 348 U.S. 483, at pp. 487-488 [75 S.Ct. 461, 99 L.Ed. 563, 571-572] ; *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d at pp. 148-149; *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d at pp. 450-451 (dissent).)

In opposition to the two-apprentice-per-shop limitation, petitioner argues in effect that would-be barbers acquire ample skills in sanitation when they finish six months of barber college education, with a curriculum ranging from histology to bleaching and tinting, then complete one and one-half years of apprenticeship under the supervision of a registered journeyman and culminate these efforts in successful passage of a qualifying examination; that the limitation of two-apprentices-per-shop superimposed upon these other requirements is palpably unreasonable; that the apprenticeship limitation contributes in no way to the skills of the barbering trade, and as observed in *Marx* v. *Maybury, supra,* 30 F.2d 839, confers no benefit upon the public at all. Additionally, it could be argued that these requirements are out of all proportion to a trade which is neither highly technical nor ex-

ceptionally difficult. (*Schneider* v. *Duer,* 170 Md. 326 [184 A. 914, 917-918].) Conceivably, such a limitation might have a monopolistic effect by limiting employment opportunities for apprentices to a number equaling twice the number of licensed shops.

These arguments may receive recognition only if there is no rationally acceptable hypothesis upon which the Legislature might have acted in adopting section 6550. In support of the law the board argues that even if the statute is construed to permit apprentice supervision by employee-barbers rather than shopowners, the former are employed to cut hair, not to supervise apprentices. The implication is that an employee-barber would not be so assiduous to teach and correct an apprentice as would the shopowner; hence, by limiting apprentices to two per shop, the Legislature was assuring itself that each apprentice would receive the personal supervision, attention and interest of the shopowner; thus he would complete his 18-month apprenticeship as a more competent practitioner of his trade. In further demonstration of statutory reasonableness, the board points out that 17 other states have similarly limited the number of apprentices per shop.[6]

Additionally, this possibility occurs: Patrons seldom recognize the difference between a haircut administered by an apprentice and one given by a journeyman; expanded opportunities for employment of low-paid apprentices rather than higher-paid journeymen might permit shopowners to exploit both public and employee; limiting the number of apprentices provides the public with some assurance of journeyman service without closing the door to adequate opportunities for on-the-job training of recruits to the trade.

Statistical records of the Board of Barber Examiners, of which we take judicial notice, demonstrate that on July 1, 1962, there were 10,972 registered barbershops in California and 7,210 registered apprentices. In the light of these statistics the two-apprentice-per-shop statute is not an actual limitation on the total number of barber apprentices in California. Thus the statute does not assert a monopolistic effect by arbitrarily reducing the number of entrants into the calling.

---

[6] In this connection the board cites the following statutes: "Fla. Stats., ch. 476.03; Idaho Code, tit. 54-503; Kan. Gen. Stats. of 1949, ch. 65, art. 1812; La. Rev. Stats. 37:353; Me. Rev. Stats. 1961 Supp., ch. 25, § 230-D; Mich. C.L., ch. 338.612 am. 1951, Acts 165; Minn. Stats. 154.03; N. J. Stats., Ann. 45:4-29; N. M. Stats., 67-14-5; N. D. Century Code, 43-04-22; Ore. Rev. Stats., § 690.030; Okla. Stats., tit. 59, § 75; Pa. Stats. Ann., tit. 63, § 562; R. I. Gen. Laws, tit. 5, ch. 27, § 13; Tenn. Code, § 62-318; Wis. Stats., Ann., 158.10 (5); Wyo. Stats., §§ 33-83."

As individuals, we might find the theories supporting the law insubstantial and inacceptable. As a court, pursuing judicially established standards, we may invalidate the statute only if these theories are devoid of any rational connection with public interest objectives as the Legislature may have conceived them. We are not able to say that the law is irrationally conceived, that the Legislature could not have accepted the board's present arguments as the basis for finding that this statute serves a public interest. Our duty ends at that point and we therefore reach an affirmative adjudication of constitutionality.

Judgment affirmed.

Pierce, P. J., and Schottky, J., concurred.