OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

| | |
|---|---|
| OPINION : | No. 89-502 |
| of : | |
| : | JANUARY 18, 1990 |
| JOHN K. VAN DE KAMP : | |
| Attorney General : | |
| : | |
| JACK R. WINKLER : | |
| Assistant Attorney General : | |
| : | |

---

THE HONORABLE ROBERT J. CAMPBELL, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following questions:

1. Does a California city have authority to enact an ordinance prohibiting the payment of less than the prevailing wages as determined by the state for public works projects on private construction projects in the city?

2. Does a California city have authority to enact an ordinance prohibiting the employment of those who have not completed or are not engaged in an apprentice program on private construction projects in the city?

CONCLUSIONS

1. A California city has authority to enact an ordinance prohibiting the payment of less than the prevailing wages fixed by the Director of the Department of Industrial Relations for public works contracts on private construction projects in the city.

2. A California city has authority to establish minimum levels of knowledge and skill required to permit employment on private construction projects in the city, including completion of or engagement in an apprenticeship program assuming provision is made for demonstration of the existence of the required knowledge and skills by other means as well.

ANALYSIS

We are asked whether a California city may, by ordinance, prohibit the payment of less than prevailing wages on private construction projects in the city. The ordinance would not apply to public works projects but it would adopt by reference the prevailing wage determinations made by the Department of Industrial Relations for public works projects which the ordinance would apply to private construction projects.

1. 89-502

We are also asked whether a California city may, by ordinance, prohibit the employment of those who have not completed or are not engaged in an apprenticeship program on private construction projects in the city. We assume the programs referred to are those contemplated and regulated by the Apprentice Labor Standards Act of 1939 (Lab. Code, § 3070 et seq.).

Since both questions concern the authority of a California city to regulate employment in private construction projects in the city by ordinance we will examine the sources of such legislative power and the legal constraints upon its exercise.

The Police Power

Article XI, section 7 of the California Constitution provides:

> "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

This section was adopted in 1970 replacing article XI, section 11 with nearly identical language which was adopted in 1879. The legislative authority granted by this section is often referred to as the "police power" which cities and counties share with the Legislature. In *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 140 the supreme court observed:

> "The Constitution itself confers upon all cities and counties the power to `make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' (Cal. Const., art. XI, section 7.) A city's police power under this provision can be applied only within its own territory; and is subject to displacement by general state law but otherwise is as broad as the police power exercisable by the Legislature itself." (Citations omitted.)

In *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 the supreme court reiterated the same view in these words:

> "Under the police power granted by the Constitution, counties and cities have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. (Cal. Const., art. XI, section 7.) Apart from this limitation, the `police power' [of a county or city] under this provision . . . is as broad as the police power exercisable by the Legislature itself." (Citing the *Birkenfeld* case.)

The "police power" is the power inherent in a government to enact laws, within constitutional limits, to protect the order, safety, health, morals and general welfare of society. (*In re Rameriz* (1924) 193 Cal. 633, 649-650.) In its inception the "police power" was closely concerned with the preservation of the public peace, safety, morals and health, without specific regard to the general welfare. Under modern conditions it includes the general welfare which embraces regulations to promote the economic welfare, public convenience, and general prosperity of the community. (*Chow* v. *Santa Barbara* (1933) 217 Cal. 673, 702.) In the *Birkenfeld* case, *supra* at p. 158, the supreme court stated:

> "It is now settled California law that legislation regulating prices or otherwise restricting contractual or property rights is within the police power if its operative provisions are reasonably related to the accomplishment of a legitimate governmental purpose [citations] and that the existence of an emergency is not a prerequisite to such legislation. [Citations.]"

2. 89-502

Of course the exercise of the police power by the Legislature or by cities and counties is subject the limitations imposed by the state and federal constitutions. A century ago the courts viewed legislation which directly affected a contract for labor as an infringement of the liberty to contract which violated the due process clause of the Fourteenth Amendment. In *Ex parte Kuback* (1890) 85 Cal. 274 the California Supreme Court held that a Los Angeles city ordinance prohibiting the employment of workers more than eight hours a day on all contracts with the city was unconstitutional because it was "a direct infringement of the rights of such persons to make and enforce their contracts." The court added that if the services to be performed were unlawful or against public policy, or were such as might be unfit for certain persons, as, for example, females or infants, the ordinance might be upheld as a sanitary or police regulation.

We will not attempt to catalog the many state and federal cases which have upheld more and more legislative regulation of economic and industrial matters including the employment contract. Instead we quote a summary provided by Justice Friedman in *Doyle* v. *Board of Barber Examiners* (1963) 219 Cal.App.2d 504, 509-514:

"The right to engage in a legitimate employment or business receives recognition as a portion of the individual freedoms secured by the due process provision of the federal and state Constitutions. [citations] This freedom is subject to the state's police power, which is simply the power to subject individuals to reasonable regulation for the purpose of achieving governmental objectives such as the public safety, health, morals and public welfare. [citations] `Reasonable regulation' implies that the regulatory objective is the welfare of the general public as contrasted with that of a special class or segment. [citation] The law must not be arbitrary; it must rest upon `adequate reason.' [citation] If the general objective of the law is within the state's regulatory power, its individual provisions must have a `real and substantial relation' to that objective. [citation] In the field of occupational licensing the requirement must have a `rational connection' with fitness to practice the particular vocation or profession; otherwise it is discriminatory and arbitrary. . . .

"These standards, caught up in the flux of social development and shifting judicial attitudes, have undergone considerable change. The tide of judicial supervision over regulatory legislation ran high during the first three decades of the century. Courts indulged in independent investigations of reasonableness and nullified statutes regarded as arbitrary. Judicial veto of economic legislation deemed to be unreasonable or arbitrary occurred in many notable decisions such as *Lochner* v. *New York* (1905) 198 U.S. 45 (nullifying legislation limiting working hours in bakeries), *Adkins* v. *Children's Hospital,* [1922] 261 U.S. 525 (invalidating a minimum wage law) and *Ribnik* v. *McBride* [1928] 277 U.S. 350 (invalidating regulation of employment agency rates). During the thirties a turn of the tide was marked by such decisions as *Nebbia* v. *New York, supra,* [(1934) 291 U.S. 502] (upholding New York's milk pricing law, and *Olsen* v. *Nebraska* [1941] 313 U.S. 236 (sustaining regulation of employment agency rates). The tide has continued in ebb stage. [ftn] A representative expression of current doctrine is *Williamson* v. *Lee Optical of Okla., supra* [1955] 348 U.S. 483, at pp. 487-488: `The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. . . . But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

"`The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.'" . . .

"The federal Supreme Court's abstention finds its California parallel. Although the state Supreme Court has continued to speak in terms of statutory reasonableness and the necessity for a real relationship between economic legislation and public weal, it has accompanied these expressions with others demonstrating a high degree of judicial self-restraint. A definitive description of judicial function in relation to the police power occurs in *Consolidated Rock Products Co.* v. *City of Los Angeles,* [1962] 57 Cal.2d 515, 522: `. . . the determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity?' Thus in *Miller [v. Board of Public Works*, 195 Cal. 477 (1925)], *supra*, this court said in 195 Cal. at page 490: `The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation . . . [W]hen the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.' [Citations.]

"Doctrinal statements as to extent of the police power are only superficially distinct from descriptions of the judicial role. Both really describe the same subject. The boundary of legislative power is situated wherever the judiciary locates a constitutional fence. When the fence is retracted, the power advances. Thus the rule of judicial self-restraint becomes nothing less than a substantive constitutional doctrine. As we understand current doctrine, judicial examination of a statute under economic due process attack is completed when any fact or facts appear which the Legislature might rationally have accepted as the basis for a finding of public interest. [Citations.] On this point federal and California doctrines appear to parallel."

Governmental authority to regulate features of employment contracts has a long history in the courts. We shall examine that history to determine first, whether the ordinance in each question comes within a California city's police power, and second whether the authority to enact the ordinance has been preempted by state law or by federal law.

<u>The Prevailing Wage Ordinance</u>

The ordinance contemplated in the first question would prohibit the payment of less than the prevailing wages determined by the California Department of Industrial Relations on private construction projects within the city. The prevailing wages referred to are those determined pursuant to chapter 1, part 7, division 2 (commencing with § 1720) of the Labor Code (referred to

herein as the "Public Works Prevailing Wage Law") governing public works projects. Section 1770[1] requires the Director of the Department of Industrial Relations to determine the general prevailing rate of per diem wages in accordance with standards set forth in section 1773. These determinations are made for numerous classifications of workmen for separate areas of the state embracing one or more counties and often incorporate collective bargaining agreements. See 8 Cal. Code of Regulations, section 16200 et seq. Section 1771 provides that no less than the general prevailing rate of per diem wages shall be paid for work of a similar character in the locality in which the public work is performed. The Public Works Prevailing Wage Law applies only to public work performed for public agencies under contract and thus has no application to private construction projects. The city ordinance would adopt the same prevailing wages as are fixed pursuant to the state law for public projects and prohibit the payment of wages lower than those prevailing wages to workers on private construction projects within the city.

The Public Works Prevailing Wage Law was held constitutional in *Metropolitan Water District* v. *Whitsett* (1932) 215 Cal. 400. At page 417 in that case the court stated:

"It is essentially a Minimum Wage Law.[2] When the schedule of wages is determined, not less than the amounts specified therein may be paid to employees on the work. The act provides that nothing therein shall be construed to prohibit the payment to any employee on the public work more than the prevailing rate."

Minimum wage legislation would appear to be an exercise of the police power as that term has been described in the foregoing analysis.[3] In *Shalz* v. *Union School Dist.* (1943) 58 Cal.App.2d 599, 606 in considering the penalty section of the Public Works Prevailing Wage Law stated: "There is no inhibition upon the state to impose such penalties for disregard of its <u>police power</u> as will insure prompt obedience to the requirements of such regulations." (Emphasis added.) Minimum wages are regulated largely although not exclusively by state and federal legislation.[4] However, a city's power to legislate under article XI, section 7 of the California Constitution is not diminished by its infrequent use. We conclude that an ordinance prohibiting the payment of wages less than the prevailing wages fixed by the state for public works projects on private construction projects in the city would fall within the city's legislative "police powers" granted to California cities

---

[1]Section references are to the Labor Code unless otherwise indicated.

[2]Cf. *San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 790 wherein the court observed: "Prevailing wage regulations are substantially different from minimum wage statutes." In so describing prevailing wage regulations the court in the two cases is looking at different aspects of a prevailing wage law. It prohibits payment of less than a particular wage and therefore is properly described as a minimum wage law. But as pointed out in the text (*infra*, at p. 9) the criteria for establishing the prevailing wage differs markedly from that used to established a minimum wage.

[3]It might be argued that because the Public Works Prevailing Wage Law applies only to public work the legislative power being exercised might be described as the states power to control its own instrumentalities as distinguished from the police power to regulate private contractual and property rights. (See *Metropolitan Water District* v. *Whitset*, *supra*, at pp. 417-418.) Should such a distinction exist it would not apply to the ordinance in question since the ordinance would not apply to public works but only to private contracts. As a measure directly regulating private wage contracts the kind of legislative power exercised by the ordinance would be the police power.

[4]See McQuillin, Municipal Corporations (Third Edition), section 24.434.

and counties by article XI, section 7 of the California Constitution unless it is "in conflict with general laws" as provided in the same section.

## Preemption

If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void. A conflict exists if the local legislation duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication. (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484; *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra*, 39 Cal.3d 878. 885.)

We consider first two state laws concerning minimum wages with which the ordinance in question might conflict. The first is the Public Works Prevailing Wage Law which has been referred to above. The second is chapter 1, part 4, division 2 of the Labor Code (commencing with § 1171 and referred to herein as the "State Minimum Wage Law") which directs the Industrial Welfare Commission (created by § 70) to ascertain the wages, hours and conditions of labor in the various occupations, trades and industries in which employees are employed in the state (§ 1173) and after finding that wages paid to employees in any occupation, trade, or industry may be inadequate to supply the cost of proper living the commission must appoint a wage board to investigate the same (§ 1178) and after considering the wage board's recommendations and public hearings the commission may adopt or amend regulations establishing minimum wages to be paid to employees (§ 1182).

We must determine whether a city ordinance prohibiting the payment of less than prevailing wages fixed by the state for public works on private construction projects in the city would conflict with either the Public Works Prevailing Wage Law or the State Minimum Wage Law because it duplicates, contradicts, or enters an area fully occupied by state law. We shall consider each of these forms of conflict in turn.

In *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 370-371, the court observed that "it has been held from an early date that an ordinance which is substantially identical with a state statute is invalid because it is an attempt to duplicate the prohibition of the statute." This was stated as an exception the general rule permitting local regulations supplementary to state statutes. The *Pipoly* opinion explained that:

> "The invalidity arises, not from a conflict of language, but from the inevitable conflict of jurisdiction which would result from dual regulations covering the same ground. Only by such a broad definition of `conflict' is it possible to confine local legislation to its proper field of supplementary regulation."

The general rule was further explained in the *Pipoly* opinion as follows:

> "Where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipality with subordinate power to act in the matter may make such new and additional regulations in aid and furtherance of the purpose of the general law as may seem fit and appropriate to the necessities of the particular locality and which are not in themselves unreasonable. [Citation.] The cases in this state have consistently upheld local regulations in the form of additional reasonable requirements not in conflict with the provisions of the general law. [Citations.]"

*Pipoly* v. *Benson*, *supra*, is referred to as California's leading case on this subject in *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 176, which in turn is cited with approval in *People* ex rel. *Deukmejian* v. *County of Mendocino*, *supra*, at page 484.

Applying the *Pipoly* rules it is clear that the ordinance in question does not duplicate the Public Works Prevailing Wage Law because it would apply the prevailing wage determinations to a different set of workers, namely workers on private construction projects rather than on public works. Their application to the State Minimum Wage Law is not so clear. Both the ordinance and the State Minimum Wage Law would prohibit wages paid to workers on private construction projects below a state determined minimum. But the state agencies and the criteria used to establish the minimum wage would be quite different. The ordinance would utilize regulations adopted by the Director of the Department of Industrial Welfare who is required by section 1773 to ascertain and consider the applicable wage rates established by collective bargaining agreements and such rates as may have been predetermined for federal public works within the locality in determining the wage rate for each craft, classification or type of work which "prevails" in the locality. On the other hand the State Minimum Wage Law is determined by the Industrial Welfare Commission on the basis of its adequacy to supply the cost of a proper living to the workers. (See § 1178.) Because of these basic differences we cannot say that the ordinance would be "substantially identical" to the State Minimum Wage Law and thus be in conflict with it as duplicate legislation under the rule of the *Pipoly* case. We conclude that the ordinance would not duplicate either state law.

As noted above the courts hold that a local ordinance conflicts with general law if it "contradicts" a state law. In 62 Ops.Cal.Atty.Gen. 90, 95 we concluded that an ordinance contradicts a state law if it attempts to permit what the state law prohibits or to prohibit what state law permits. We think that conclusion is supported by *Ex parte Daniels* (1920) 183 Cal. 636, 642-645 cited in *People* ex rel. *Deukmejian* v. *County of Mendocino*, *supra*, at page 484, as authority for the rule that local legislation conflicts with state law if it "contradicts" state law. Applying the rule to the ordinance the question is whether the State Minimum Wage Law authorizes that which the ordinance prohibits. The ordinance prohibits payment of less than the prevailing wage on private construction contracts in the city. The State Minimum Wage Law prohibits the payment of less than the minimum wage fixed by the regulations of the Industrial Welfare Commission. We find nothing in the State Minimum Wage Law which purports to authorize the payment of any wage. It simply prohibits the payment of less than the minimum wage fixed by the regulations. The ordinance does not prohibit what the state law authorizes and thus does not contradict the State Minimum Wage Law. We conclude that the ordinance would not contradict either state law.

Local legislation conflicts with general law if it enters an area fully occupied by general law, either expressly or by legislative implication. (*People* ex rel. *Deukmejian* v. *County of Mendocino*, *supra*.) We have found nothing in either the Public Works Prevailing Wage Law or the State Minimum Wage Law which expresses any legislative intent that either or both of those statutes were meant to provide the only legislation regulating minimum wages in the state. (Cf. Veh. Code, § 21 which prohibits any local authority from enacting any ordinance on matters covered by the Vehicle Code unless expressly authorized therein.) Nevertheless, state law may preempt the field by legislative implication.

> "The test for determining whether the area is fully occupied on the basis of legislative implication was established in *In re Hubbard*, [1964] 62 Cal.2d 119, 128. In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: `(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially

covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.'" (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra*, at p. 485.)

Looking to the purpose and scope of the Public Works Prevailing Wage Law we find the Legislature expressly limited its application to public works and thus the Legislature indicated no state concern in that law about the wages paid on private construction projects. We do not see how an ordinance prohibiting the payment of less than the prevailing wage on private construction projects in a city would adversely affect the transient citizens of the state who might visit the city. We conclude that the Public Works Prevailing Wage Law does not preempt by legislative implication the regulation of minimum wages on private construction projects in the city.

The purpose and scope of the State Minimum Wage Law is much broader than the Public Works Prevailing Wage Law. Its stated purpose is to establish "a minimum wage adequate to supply the necessary cost of proper living to, and maintain the health and welfare of employees in this state." (§ 1178.5.) This includes workers on private construction contracts in California cities. We see nothing in the State Minimum Wage Law suggesting that the subject matter of minimum wages has been so fully and completely covered as to clearly indicate it has become exclusively a matter of state concern or of such paramount state concern that it will not tolerate further or additional local action. The provisions of section 1182 to raise the state minimum wage whenever the federal minimum wage is raised above the state minimum recognizes that the State Minimum Wage Law is not exclusive. Similarly, section 1173 recognizes the overlapping jurisdiction of the Occupational Safety and Health Standards Board. The existence of the Public Works Prevailing Wage Law establishing a different minimum wage (presumably a higher "prevailing" wage) on public works contracts also indicates that the Legislature did not intend the State Minimum Wage Law to be exclusive. Transient citizens of the state would not appear to be affected by an ordinance establishing a higher minimum wage on private construction contracts in the city than is required by the State Minimum Wage Law. We conclude that the State Minimum Wage Law does not preempt local minimum wage regulations by impliedly occupying the field of minimum wage legislation.

In *Chavez* v. *Sargent, supra,* the supreme court held that a county's "right-to-work" ordinance which prohibited agreements which excluded any person from employment because of non-membership in a labor organization was invalid because it conflicted with state statutes which authorized and encouraged collective bargaining agreements, including agreements requiring all employees to be members of a union. After quoting from the *Pipoly* case as we have above the court (at p. 177) stated:

"State regulation of a subject may be so complete and detailed as to indicate an intent to preclude local regulation. [citations] In this connection it may be significant that the subject is one which, in our view, as in *Tolman* v. *Underhill* [(1952) 39 Cal.2d 708, 713] requires uniform treatment throughout the state. Furthermore, and of significance in impelling a conclusion that no part of the local ordinance can be effective, is the fact that in aspects wherein it does not substantially either parallel or breach specific state legislation it conflicts, as hereinafter explained, with a general legislative declaration of policy. [Citations.]

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Legislature has not enacted a completely detailed scheme of regulation of the `field' which this ordinance is principally designed to affect; i.e., the legality of jurisdictional (or jurisdictional-organizational) strikes and of union shop or security agreements and conduct intended to attain or enforce such agreements, but it has declared both a general policy and basic regulations in implementation thereof which, as we view them, are fully comprehensive of the field. . . ."

The *Chavez* case teaches that the legislative "field" of regulation of jurisdictional and organizational strikes and of union shop agreements and conduct intended to attain or enforce such agreements has been preempted by state law. It does not follow that other fields of labor contract regulation are similarly preempted by state law. In fact the *Chavez* court (at p. 213) noted that the Legislature had not stated what procedure for the attainment of union designation or authorization should be followed by a union which represents some but not all of the employees of an employer who may or may not desire union representation. Significantly for our purposes the Chavez court, in referring to such procedures (at p. 213) added: "The ordinance here under consideration does not properly regulate these last mentioned matters which the Legislature has left unregulated." Had the ordinance addressed just these unregulated procedures the court suggests such regulation would have been "proper." Thus the court recognized that there were areas of regulation of labor contracts, including portions of the field of union shop regulation, which were not fully occupied by state law and were therefore open to regulation by cities and counties.

It has been suggested that an ordinance prohibiting the payment of less than the prevailing wage on private construction projects in the city is preempted by federal law, specifically the National Labor Relations Act and federal labor policy. The courts have rejected this suggestion in *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 602-604; *California Manufacturers Assn.* v. *Industrial Welfare Commission* (1980) 109 Cal.App.3d 95, 118-123; *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 251. In the *Rivera* case (at p. 602) the court noted that preemption is primarily a matter of congressional intent citing *San Diego Bldg. Trades Council* v. *Garmon* (1959) 359 U.S. 236. 239-240. In all three state cases cited above the court of appeals quoted a clause which has been a part of the Fair Labor Standards Act ever since its enactment in 1938 (29 U.S.C. § 218): "No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter . . ." We conclude that a city ordinance prohibiting the payment of less than the prevailing wage on private construction projects in the city is not preempted by federal law.

We conclude that a city ordinance prohibiting the payment of less than the prevailing wage fixed for public projects on all private construction projects in the city is within the legislative powers of all California cities granted by article XI, section 7 of the California Constitution and that such an ordinance would not be in conflict with general law within the meaning of that section or in conflict with federal law.

### The Apprentice Program Ordinance

The second question asks whether a California city has authority to enact an ordinance prohibiting the employment of those who have not completed or are not engaged in an apprentice program on private construction projects in the city? We have assumed that the apprentice programs referred to are those contemplated and regulated by the Apprentice Labor Standards Act of 1939 (Lab. Code, § 3070 et seq.).

Section 460 of the Business and Professions Code provides:

"No city or county shall prohibit a person, authorized by one of the agencies in the Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation, or profession or any portion thereof. Nothing in this section shall prohibit any city or county or city and county from levying a business license tax solely for revenue purposes nor any city or county from levying a license tax solely for the purpose of covering the cost of regulation."

This section would preclude a city or county from prohibiting those licensed by the Board of Architectural Examiners, the Contractors State License Board, the Board of Geologists and Geophysicists, the Board of Landscape Architects, the Board of Registration for Professional Engineers and Land Surveyors, and the Structural Pest Control Board from practicing their professions and occupations within the scope of their respective licenses without further regulation by a city or county except for a business tax for revenue purposes.

Business and Professions Code section 7032 in the Contractor's State License Law (Bus. Prof. Code, § 7000 et seq.) states that that law does not limit the authority of cities and counties to enact ordinances requiring building permits and inspections and adds: "Nothing contained in this section shall be construed as authorizing a city or county to enact regulations relating to the qualifications necessary to engage in the business of contracting." This language reiterates the prohibition of section 460 quoted above with respect to those licensed by the Contractors State License Board.[5] However, we are not aware of any state agency in the Department of Consumer Affairs which licenses or otherwise regulates any person's practice of one of the construction trades in California. We conclude that the ordinance contemplated by the second question would not conflict with any state law.

In our review of the police power we quoted at length from the opinion in *Doyle* v. *Board of Barber Examiners*, *supra*, tracing the development of economic legislation under the due process clause of the Fourteenth Amendment. The *Doyle* case pointed out that the right to engage in a legitimate employment or business receives recognition as a portion of the individual freedoms secured by the due process provision of the federal and state Constitutions. It added that this freedom is subject to the state's police power, which is simply the power to subject individuals to reasonable regulation for the purpose of achieving governmental objectives such as the public safety, health, morals and public welfare. Specifically, for the purpose of the second question, the *Doyle* court added: "In the field of occupational licensing the requirement must have a `rational connection' with fitness to practice the particular vocation or profession; otherwise it is discriminatory and arbitrary." In support of the last quoted statement the *Doyle* court cited *Whitcomb* v. *Emerson* (1941) 46 Cal.App.2d 263, 273-274.

In *Whitcomb* v. *Emerson*, *supra*, plaintiff challenged a state statute requiring her to have a license to practice cosmetology which was defined to include upper body massage and hairdressing. Since her long established practice was confined to upper body massage she objected to the requirement that she learn hairdressing to obtain the license to continue her practice. The court held the statute unconstitutional. In its opinion the court, at p. 273, observed:

---

[5]To the extent that 43 Ops.Cal.Atty.Gen. 115 (1964) indicates that the field of regulation preempted by the Contractors State License Law extends to the regulation of the competency of employees of contractors who are exempted from licensure under that law, that opinion is disapproved. In our view the legislative purpose of the exemption for employees was simply to exempt them from being licensed as contractors, not that they were to be exempt from any other form of regulation.

"In approaching the problem here involved we deem these truths to be established by reason and law. Those things which are of themselves evil may be prohibited. Those things which, though not evil in themselves, if practiced by those not adequately trained therein by education and experience, or by those not morally qualified or of sufficient age or discretion, may endanger the health, safety, morals or general welfare of the people, may not be prohibited but may be controlled by reasonable regulation.

". . . . . . . . . . . . . . . . . . . . . . . . .

". . . The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application that they can operate to deprive one of his right to pursue a lawful vocation.' (*Dent* v. *West Virginia* [1889] 129 U.S. 114.)"

In *Rees* v. *Department of Real Estate* (1977) 76 Cal.App.3d 286, Rees appealed an order prohibiting him from acting as an advance fee rental agent without having a license required by state law. He argued there was no reasonable relationship between the skills required in the conduct of his business and those subject to regulation under the real estate licensing laws citing *Whitcomb* v. *Emerson*, *supra*. The court observed (on p. 298) that the *Whitcomb* case was the product of an "era less receptive to economic legislation," quoting from *Varanelli* v. *Structural Pest Control Board* (1969) 1 Cal.App.3d 217, 222. The *Rees* court (at p. 299) also quoted from the *Varanelli* case as follows: "The current doctrine of judicial review of the reasonableness of regulatory legislation is that judicial examination of a statute under economic due process attack is completed when any fact or facts appear, or may be hypothesized, which the Legislature might rationally have accepted as the basis for a finding of public interest." After inferring a legitimate public purpose to protect prospective renters from the actions of unprincipled or unqualified individuals the court held that the licensing law met constitutional due process requirements.

We have little difficulty in hypothesizing a public safety purpose for an ordinance which prohibits the employment of persons in the construction trades who do not possess a certain level of skill and knowledge in their respective trades. That a state may impose requirements on those who practice the building trades as well as other occupations and professions to assure some degree of skill and competence for the protection of the public under its police powers we have no doubt.[6] Since the State Legislature has not seen fit to preempt this field of legislation, California

---

[6]"Plumbers and plumbing are subject to reasonable municipal regulation under the police power to protect the public health and welfare." (McQuillin, Municipal Corporations, § 24.338 (3d Ed.).)

counties and cities possess the same legislative power under article XI, section 7 of the California Constitution. We think that participation in or completion of an apprenticeship program would be a reasonable measure of the skill and knowledge needed to protect the safety of the public in a private construction project. We assume that any ordinance imposing such requirements would be sufficiently certain to avoid the procedural due process infirmities of vagueness and overbreadth. (See *People* v. *Katrinak* (1982) 136 Cal.App.3d 145, 156-157.) We conclude that an ordinance which prohibited those who had not completed or were not engaged in an apprenticeship program from employment on private construction projects in the city would meet constitutional due process requirements.

An ordinance which prohibits those who have not completed or are not engaged in an apprenticeship program from employment in private construction projects in the city classifies those who have learned their trade in an apprenticeship program apart from those who have learned the trade in some other manner. Such classification requires a consideration whether the ordinance meets constitutional requirements for equal protection of the laws. The courts have developed two tests for determining whether equal protection requirements are met depending on the nature of the classification. The conventional "rational relationship" test is traditionally applied in cases involving occupational licensing although in certain cases involving occupational regulation the more stringent "strict scrutiny" test has been employed. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 17.)

The "rational relationship" test "requires merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citation.] So long as such a classification does not permit one to exercise the privilege while refusing it to another of like qualifications, under like conditions and circumstances, it is unobjectionable upon this [equal protection] ground. Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon the party who assails it. [Citations.]" (*D'Amico* v. *Board of Medical Examiners*, *supra*, at pp. 16-17.) "A more stringent test is applied, however, in cases involving `suspect classifications' or touching on `fundamental interests.' Here the courts adopt an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [citations] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose." (*D'Amico* v. *Board of Medical Examiners*, *supra*, at p. 17; emphases by the court.)

In view of the court's review of the cases and the limitation on the application of the strict scrutiny test to classifications in occupational licensing laws in *D'Amico* v. *Board of Medical Examiners*, *supra*, at pages 17-18 we believe the courts would apply the rational relationship test to the classification created by the ordinance contemplated in the second question. (See also *Goodman* v. *Cory* (1983) 142 Cal.App.3d 737, 743-744.)

In the *D'Amico* case the court considered a state statute which barred holders of D.O. degrees from osteopathic colleges from licensure as physicians and surgeons without respect to the school conferring that degree or the applicant's ability to pass the examination. (*Id.* at 19, fn. 14.) The court held that the decision of the Court of Appeal that the "strict scrutiny" test applied to the

And see *Application of Beaver* (1946) 60 N.Y.S.2d 675 in which the court denied Beaver's application for an order directing the Board of Plumbers and Plumbing for the City of White Plains to certify him as a master plumber when he had passed the examination but had no experience where the statute required him to submit to an examination by the board on both this experience and qualifications.

classification created by the statute was erroneous but nevertheless concluded that the statute violated equal protection requirements applying the conventional "rational relationship" test. The court noted (at p. 22) that the "only legitimate state interest which might conceivably be advanced by the classification in question is that of protecting the public of this state from harm suffered at the hands of poorly trained or incompetent medical practitioners." It was established (*id.* at 23) that osteopathy, like allopathy, is a complete school of medicine and surgery whose practitioners successfully engage in the full range of activities commonly thought of as constituting the practice of medicine. The court held that the statutes which "forbid the licensure of graduates of osteopathic colleges as physicians and surgeons in this state regardless of individual qualifications, deny to plaintiffs the equal protection of the laws guaranteed by our state and federal Constitutions and are therefore to that extent void and of no effect." (*Id.* at p. 24.) The court further held that plaintiffs were entitled to take the tests for licensure as a physician and surgeon in California.

Completion of an apprentice program is not the only way a person may acquire the requisite knowledge and skills to practice one of the construction trades. The same competence produced by an apprentice program might be acquired in a trade school, or by training and experience gained in the military or other governmental service, or by training and experience in a different city, state or country not having apprenticeship requirements. Unless the city's ordinance makes some provision which would allow practice of a trade by those determined to have knowledge and skill to practice a trade equivalent to that provided by an apprenticeship program but who acquired such competence in some other manner a court might find the ordinance denies equal protection of the laws to such persons.

We believe that a California city has authority under article XI, Section 7 of the California Constitution to impose requirements on those who practice the building trades within the city to assure some degree of skill and competence for the protection of the public. While such requirements often take the form of testing for the requisite knowledge and skill a city may utilize some other criteria which might reasonably demonstrate the requisite knowledge and skill. This might include successful completion of specified trade schooling or practice of the trade for a specified period. We believe that a court would find that completion of an apprentice program would be a reasonable method of assuring that a person has the requisite knowledge and skill to practice the trade. We also believe that permitting a person to engage in a trade as an apprentice with the supervision required by the apprentice program would also be found to be a reasonable exception to such a requirement. However, any such requirements must make provision for those who have learned a trade in some other manner to demonstrate that they have acquired the knowledge and skill equivalent to that gained in an apprentice program which would then authorize them to practice their trade in the city.

We conclude that a California city has authority to establish minimum levels of knowledge and skill required to permit employment on private construction projects in the city, including completion of or engagement in an apprenticeship program assuming provision is made for demonstration of the existence of the required knowledge and skills by other means as well.

\* \* \* \* \*